RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 04a0347p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITIZENS COAL COUNCIL and KENTUCKY RESOURCES
COUNCIL, INC.,

        *Petitioners,*

    *v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
and MIKE LEAVITT, in his capacity as Administrator of
the ENVIRONMENTAL PROTECTION AGENCY,

        *Respondent.*

No. 02-3628

---

On Petition for Review of a Final Decision of the
Environmental Protection Agency.
No. 40 CFR Parts 9 & 434.

Argued: January 29, 2004

Decided and Filed: October 7, 2004

Before: SUHRHEINRICH and CLAY, Circuit Judges; GWIN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Thomas J. FitzGerald, Frankfort, Kentucky, for Petitioners. J. Steven Rogers, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Thomas J. FitzGerald, Frankfort, Kentucky, for Petitioners. Thomas H. Pacheco, UNITED STATES DEPARTMENT OF JUSTICE, San Francisco, California, for Respondents.

    GWIN, D. J., delivered the opinion of the court, in which CLAY, J., joined. SUHRHEINRICH, J. (pp. 15-18), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

    JAMES S. GWIN, District Judge. Here, a Kentucky nonprofit corporation (the Kentucky Resources Council) and a national organization that advocates clean-living conditions for residents of the nation's coalfields (the Citizens Coal Council) petition this Court to invalidate a final rule that the Environmental

---

    [*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

Protection Agency promulgated on January 23, 2002 ("Final Rule").[1]  We refer to the Kentucky Resources Council and the Citizens Coal Council collectively as "Petitioners" and the Environmental Protection Agency as "EPA."

The Final Rule applies to once-abandoned coal mines that operators later reopen and remine.  In addition, the Final Rule applies to coal mines in the arid regions of the Western interior states.  Petitioners argue that the EPA's Final Rule exceeds its statutory mandate and urge this Court to strike it down.

For the following reasons, we invalidate the regulations the EPA promulgated in the January 23, 2002 Final Rule, and remand.

## BACKGROUND

The Clean Water Act ("CWA")[2] is an enigmatical piece of legislation.  Filled with more sesquipedalian jargon than a year's subscription to any trade journal and a byzantine system of cross references, its intricacies are virtually indecipherable.[3]  Perhaps this explains the parties' inability to agree on seemingly any aspect of the statute or the EPA's Final Rule.  What follows is our attempt to navigate this legislative labyrinth and to translate its environmentalese into English:

The CWA seeks to restore and maintain the integrity of the nation's water.[4]  To further the goals of restoring and maintaining clean water, the CWA includes both technology-driven limits and water-quality-based limits on pollution.[5]  The technology-based limits aim to prevent pollution by requiring polluters to install and implement various forms of technology designed to reduce the pollution discharged into the nation's waters.[6]  On the other hand, the water quality regulations  kick in once a given body of water's pollution level exceeds the level that a state deems acceptable for the body of water's intended use or function.[7]  They endeavor to cure an aquatic tragedy of the commons where the aggregate impact of polluters' activities–despite compliance with the technology-based regulations–causes unacceptable pollution.  When this happens, the water-quality-based regulations ratchet up the pollution control required of individual polluters.[8]

The technology-driven regulations are complex, and take the form of "effluent limitation guidelines." An "effluent limitation" is "any restriction [including schedules of compliance] established . . . on the quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are

---

[1] Pursuant to Fed. R. App. P. 43(c)(2), the Court has substituted Mike Leavitt for Christine Whitman, who was sued in her official capacity.

[2] 33 U.S.C. § 1251, *et seq.*

[3] To illustrate the ridiculous number of cross references, consider the following: CWA § 304(b)(4)(B) (codified at 33 U.S.C. § 1314(b)(4)(B)), refers readers to § 301(b)(2)(E) (codified at 33 U.S.C. § 1311(b)(2)(E)), which then refers readers back to § 304(a)(4) (codified at 33 U.S.C. § 1314(a)(4)).  Readers must follow this circuitous path to discover merely that § 304(b)(4)(B) pertains to "conventional pollutants."

[4] 33 U.S.C. § 1251; *see also B.P. Exploration & Oil v. EPA*, 66 F.3d 784, 789 (6th Cir. 1995).

[5] *See Nat. Res. Defense Council v. EPA*, 915 F.2d 1314, 1317 (9th Cir. 1990).

[6] *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 927 (5th Cir. 1998).

[7] *Nat. Res. Defense Council*, 915 F.2d at 1317 (citing 33 U.S.C. §§ 1312, 1313).

[8] *Id.*

discharged from point sources into . . . water[].”[9]  The CWA requires the EPA to issue effluent limitation guidelines for various types of “point sources.”  A “point source” is “any discernible, confined and discrete conveyance . . . [such as a pipe, ditch, or channel] from which pollutants are or may be discharged.”[10]  The EPA’s effluent limitation guidelines are technology-based regulations.  They require polluters to adopt certain technologies aimed at reducing pollution.

Section 304 of the CWA charges the EPA with duties related to setting effluent limitation guidelines for existing sources of pollution.[11]  Under § 304(b)(3), the EPA must identify the specific control measures and practices available to the various categories and classes of point sources.[12]  The EPA must then identify, in terms of the amount of pollutants, the pollution reduction (or, in Clean Water Act jargon, “effluent reduction”) attainable through application of the three different levels of technology–best practicable control technology (“BPT”),[13] best available technology economically achievable (“BAT”),[14] and best conventional pollutant control technology (“BCT”).[15]  It must also identify the factors it will consider when deciding which control measures and practices apply to each of the various classes and categories of point sources.[16]

Beyond these §304 requirements, § 301 of the CWA requires that the effluent limitations attainable by the various levels of technology “shall be achieved” by various dates, all at least fifteen years in the past.[17]  More specifically, point sources discharging toxic and nonconventional pollutants must apply the best available technology economically achievable (“BAT”) to meet the BAT effluent limitations.[18]  Similarly, point sources discharging conventional pollutants must apply the best conventional pollutant control technology (“BCT”) to meet the BCT effluent limitations.[19]

---

[9] 33 U.S.C. § 1362(11).

[10] *Id*. at § 1362(14).

[11] For new sources of pollution, a similar system of regulations applies. *See id.* at § 1316.  Because Petitioners do not directly challenge these “new source performance standards” (“NSPS”), discussing their regulations is beyond the scope of this opinion.

[12] *Id.* at § 1314(b)(3).

[13] *Id.* at § 1314(b)(1)(A).

[14] *Id.* at § 1314(b)(2)(A).  In this particular subsection, Congress used the term “best control measures and practices achievable.”  From the remainder of the statute, it appears that this provision is meant to read “best available technology economically achievable”–or at least means the same thing.  Both parties’ briefs reflect this interpretation.

[15] *Id.* at § 1314(b)(4)(A).

[16] *Id.* at §§ 1314(b)(1)(B); 1314(b)(2)(B); 1314(b)(4)(B).

[17] *Id.* at § 1311(b).  Dischargers with point sources requiring best practicable control technology were to achieve the goals by July 1, 1977. *Id.* at § 1311(b)(1)(A). March 31, 1989 was the applicable date for point sources requiring the best conventional pollutant control technology, *id.* at § 1311(b)(2)(E), and best available technology economically achievable, *id.* at §§ 1311(b)(2)(C)–(D), (F).

[18] *Id.* at § 1311(b)(2)(A).

[19] *Id.* at § 1311(b)(2)(E).

These limitations, however, are not self-executing. Instead, they create binding obligations on dischargers only through National Pollutant Discharge Elimination System ("NPDES") permits.[20] The CWA forbids anyone from discharging any pollutant without an NPDES permit.[21] The EPA Administrator may issue permits to individual polluters only if the permitted discharges comply with the requirements for effluent limitations set out in § 301 of the CWA.[22] In issuing an NPDES permit, the EPA places the polluter into the appropriate point source category and subcategory. The EPA next assigns the appropriate level of technology to the polluter. Finally the EPA sets limits, for various pollutants, on how much the polluter may discharge. In setting the limits in individual permits, the EPA imports standards from the effluent limitations guidelines issued under CWA § 304(b). EPA then applies the numeric limitations to the discharger[23] via the NPDES permit.[24] Thus, the technology-based effluent limitations become binding on polluters through NPDES permits.

To set the effluent limitation guidelines under CWA § 304(b), the EPA broke down the various point sources by industry. The EPA established the Coal Mining Point Source Category as one of its industry categories.[25] In 1985, the EPA amended the effluent limitation guidelines and requirements concerning the Coal Mining Point Source Category by creating four subcategories. They were:

1)      Coal Preparation Plants and Coal Preparation Plant Associated Areas

2)      Acid or Ferruginous Mine Drainage

3)      Alkaline Mine Drainage

4)      Post Mining Areas.[26]

In seeking an NPDES permit, each coal mining operation was placed into one of these four subcategories. From then on, whenever a coal mining operation applied for an NPDES permit, the EPA incorporated the effluent limitation guidelines corresponding to the appropriate subcategory for that operation.

Under the 1985 regulations, these four subcategories did not include a category for coal mining operations that sought to remine previously mined, but later-abandoned, lands ("remining operations" or "reminers"). Technological advances made it feasible and potentially profitable to mine such lands. However, the same regulations for miners of virgin lands applied also to coal reminers. Faced with a need to bring remining operations into compliance with the same standards used for first-time mining, potential reminers allowed abandoned mines to remain fallow, often with resulting untreated pollution from "pre-existing discharges" that could otherwise have been treated. By using the same standards for both the

---

[20] *See, e.g., Am. Paper Inst., Inc. v. EPA,* 996 F.2d 346, 350 (D.C. Cir. 1993).

[21] 33 U.S.C. § 1311(a).

[22] *Id.* at § 1342(a).

[23] Under the CWA, "discharge" refers to any addition of any pollutant to navigable waters from any point source. 33 U.S.C. § 1362(12) & (16). "Discharger" and "polluter" are therefore used interchangeably.

[24] In addition to these technology-based regulations, the CWA also implements water-quality-based regulations. These latter regulations are based upon the desired uses and condition of individual waterways. The water-quality-based requirements were intended by Congress to supplement the effluent limitations. Through the water quality standards, EPA may place additional obligations on a point source to prevent the water from falling below acceptable standards.

[25] *See* 40 C.F.R. § 434.
[26] 50 Fed. Reg. 41296 (1985).

mining of virgin land and the remining of abandoned mines, the regulations imposed a large potential liability for anyone who took over the land encompassing the abandoned mines.

Responding to the disincentive for remining, Congress passed several amendments to the CWA in 1987, including one that West Virginia Representative Nick Rahall proposed. The "Rahall Amendment" became § 301(p) of CWA.[27]

With his amendment, Rep. Rahall sought to stimulate the remining of abandoned coal mines by exempting certain remining operations from the otherwise-applicable national effluent limitations.[28] Rather than requiring remining operations to meet the national effluent limitation guidelines mandated by the 1985 amendments, the Rahall Amendment allowed the NPDES permit writer (the EPA Administrator or a corresponding state administrator)[29] to waive these requirements in favor of a modified permit. Under the Rahall Amendment, modified permits incorporate site-specific numerical limits for pre-existing discharges of iron, manganese, and pH based upon the Administrator's "best professional judgment." However, the Rahall Amendment forbade the EPA (or state) Administrator to issue a permit if remining would cause discharges that exceeded the pre-existing levels of pollutants found in surrounding waterways.[30] The Rahall Amendment also required that applicants for these "Rahall permits" provide evidence that the remining operations would potentially improve the quality of the water in the area, and that the permits comply with applicable state water quality standards.

The Rahall Amendment sought to make remining economically feasible. Congress believed that remining would improve the water quality of abandoned mines, an improvement that would not have occurred under the more stringent guidelines that applied to all mined lands.

## EPA'S FINAL RULE

The challenged EPA Final Rule creates two new subcategories under the Coal Mining Point Source Category and sets regulations for both. These new subcategories are (1) the Coal Remining Subcategory, and (2) the Western Alkaline Coal Mining Subcategory. We discuss them in turn.

### Coal Remining Subcategory

The Final Rule creates a first new subcategory known as the Coal Remining Subcategory. The regulations for this subcategory apply to all "pre-existing discharges" at "coal remining operations." "Pre-existing discharges" are "any discharge[s] resulting from mining activities that have been abandoned prior to the time of a remining permit application."[31] A coal remining operation is "a coal mining operation at a site on which coal mining was previously conducted and where the site has been abandoned or the performance bond has been forfeited."[32]

The regulations require that every remining operator create a site-specific Pollution Abatement Plan and submit it to the EPA or the state agency with authority to issue NPDES permits.[33] Remining operators must include in their Pollution Abatement Plans "best management practices," and they must design the

---

[27] 33 U.S.C. § 1311(p).

[28] For the purposes of the Rahall Amendment, a remining operation is one that commenced after February 4, 1987 at a site where coal mining had ceased before August 3, 1977. 33 U.S.C. § 1311(p)(3)(A).

[29] In jurisdictions where EPA has authorized a state agency to administer the NPDES program, state agencies may issue NPDES permits. *See* 33 U.S.C. § 1342(a)–(d).

[30] 33 U.S.C. § 1311(p)(2).

[31] 40 C.F.R. § 434.70(b) (2004).

[32] *Id.* at § 434.70(a).

[33] *Id.* at § 434.72(a).

plans "to reduce the pollution load from pre-existing discharges[.]"[34] Further, each Pollution Abatement Plan "must describe the design specifications, construction specifications, maintenance schedules, criteria for monitoring and inspection, and expected performance of [best management practices]."[35] Under the Final Rule, these Pollution Abatement Plans qualify as the best practicable control technology currently available (BPT),[36] the best achievable technology economically achievable (BAT),[37] and the best conventional pollutant control technology (BCT) for remining operators.[38]

The Final Rule also sets effluent limitations for four pollutants–total iron, total manganese, net acidity, and total suspended solids ("TSS"). For each pollutant, the required effluent limitation is that the discharger "[m]ay not exceed baseline loadings[.]"[39] Baseline loadings are background conditions--i.e., those that exist when remining commences. The Final Rule defines the procedures for measuring them.[40] However, if the EPA or the state permitting authority concludes that collecting samples to measure baseline pollutant loadings is infeasible[41] and that remining "will result in significant improvement that would not otherwise occur," then no measurable effluent limitations apply.[42] The permitting authority apparently has unfettered discretion in making such determinations. These regulations apply to all three levels of technology.[43]

## Western Alkaline Coal Mining Subcategory

The EPA's Final Rule also creates, and establishes effluent limitations for, the Western Alkaline Coal Mining Subcategory. The Final Rule regulates certain types of drainage in certain areas of "western coal mining operations."[44] "Western coal mining operations" are "surface or underground coal mining operation[s] located in the interior western United States, west of the 100th meridian west longitude, in an arid or semiarid environment with an average annual precipitation of 26.0 inches or less."[45]

EPA's Final Rule sets no uniform standards for drainage at western coal mining operations. Instead, western alkaline coal mining operators must create "a site-specific Sediment Control Plan . . . designed to prevent an increase in the average annual sediment yield form pre-mined undisturbed conditions."[46] Like the Pollution Abatement Plans described above, each Sediment Control Plan "must identify best

---

[34] *Id.*

[35] *Id.*

[36] *Id.* at § 434.72.

[37] *Id.* at § 434.73.

[38] *Id.* at § 434.74.

[39] *Id.* at 434.72(b)(1).

[40] *See id* at § 434 App. B.

[41] The Final Rule provides several examples of when such measurement would be infeasible:
Pre-existing discharges for which it is infeasible to collect samples for determination of baseline pollutant levels include, but are not limited to, discharges that exist as a diffuse groundwater flow that cannot be assessed via sample collection; a base flow to a receiving stream that cannot be monitored separate from the receiving stream; a discharge on a steep or hazardous slope that is inaccessible for sample collection; or, a number of pre-existing discharges so extensive that monitoring of individual discharges is infeasible.
*Id.* at § 434.72(b)(2).

[42] *Id.* at § 434.72(b)(2).

[43] *Id.* at §§ 434.72, 434.73, & 434.74.

[44] *Id.* at § 434.81. More specifically, the Rule's regulations apply to "alkaline mine drainage," *id.* at § 434.81(a), and to drainage with (1) pH equal to or greater than 6.0, (2) dissolved iron concentration less than 10 mg/L, and (3) net alkalinity greater than zero, *id.* at § 434.81(b).
Further, the regulation applies only to reclamation areas, brushing and grubbing areas, topsoil stockpiling areas, and regraded areas. *Id.* at § 434.82. These different areas are all defined in 40 C.F.R. § 434.80; the definitions are beyond the scope of our analysis.

[45] *Id.* at § 434.80(f).

[46] *Id.* at § 434.82(a).

management practices (BMPs) and also must describe design specifications, construction specifications, maintenance schedules, criteria for inspection, as well as expected performance and longevity of the best management practices."[47]   Sediment Control Plans need not include numerical limitations on sediment. Instead, Operators must demonstrate "[u]sing watershed models" that the Sediment Control Plans "will result in average annual sediment yields that will not be greater than the sediment yield levels from pre-mined, undisturbed conditions."[48]   Beyond that, the operators' only obligation is to implement and maintain the best management practices described in the Sediment Control Plan.[49]   These requirements constitute BPT,[50] BAT,[51] and BCT.[52]

## STANDARD OF REVIEW

Petitioners challenge an EPA rule promulgated through informal rulemaking.  Therefore, we review the Final Rule under the Administrative Procedure Act ("APA").[53]   Under the APA, we invalidate an informal rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law."[54]

An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[55]   Further, an agency abuses its discretion when it fails to consider a factor the statute directs it to consider in promulgating regulations.[56] The Court must undertake a "searching and careful review" to determine whether an agency action was arbitrary and capricious, but "the ultimate standard of review is a narrow one."[57]

This standard directs courts to grant substantial deference to administrative agencies.  The Court may not substitute its own judgment for that of the agency.  Instead, the Court must decide whether a rational relationship exists between the statute's purposes and the agency's action and whether "there is substantial evidence in the record to support it."[58]   Further, the agency's decision "is entitled to a presumption of regularity."[59]   With this standard in mind, we turn to Petitioners' challenges to the Final Rule.

## PARTIES' ARGUMENTS

Petitioners attack the Final Rule on several fronts.  Regarding the Coal Remining Subcategory, they argue that it is inconsistent with CWA § 301(p), the Rahall Amendment.  Petitioners claim four inconsistencies.  First, they argue that the definition of "coal remining operation" in the Final Rule differs from the Rahall Amendment's definition of that term.  Second, Petitioners say, the Final Rule adds total suspended solids ("TSS") to the list of pollutants that are to receive relaxed standards.  While the Rahall

---

[47] *Id.*

[48] *Id.* at § 434.82(b).

[49] *Id.* at § 434.82(c).

[50] *Id.* at § 434.82.

[51] *Id.* at § 434.83.

[52] *Id.* at § 434.84.

[53] 5 U.S.C. § 551, *et seq.*

[54] *Id.* at §§ 706(2)(A), (C)–(D).

[55] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

[56] *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).

[57] *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971).

[58] *Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1031 (5th Cir. 1985).

[59] *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 198 (5th Cir. 1989).

Amendment relaxes standards for only pH, manganese, and iron, the Final Rule includes TSS. Third, Petitioners argue that the Final Rule's lack of numerical limits on effluents runs afoul of the Rahall Amendment's requirement of numerical limits. Finally, Petitioners argue that the Final Rule differs from the Rahall Amendment by applying the otherwise-applicable standards (rather than modified standards) to pre-existing discharges that reminers commingle with discharges from active mining operations. According to Petitioners, the EPA should regulate these discharges under the relaxed Rahall Amendment standards. For these reasons, Petitioners argue that the Final Rule is inconsistent with the text, and also the purpose, of the Rahall Amendment.

Concerning the Western Alkaline Coal Mining Subcategory, the Petitioners offer four arguments for their challenge. First, they argue that best management practices are not appropriate effluent limitation guidelines because they do not impose numeric limitations on pollution. Second, they argue that the Administrator has not shown that continued imposition of the currently applicable effluent limitations is infeasible. Third, they argue that the entire subcategory of Western Alkaline Coal Miners is irrational and overbroad. Finally, Petitioners argue that the EPA's goal in creating the subcategory is inconsistent with the CWA and the Surface Mining Control & Reclamation Act ("SMCRA").

The EPA defends the Final Rule, both subcategories, and its regulations applicable to them. In general, the EPA says that the Rahall Amendment does not constrain the EPA's power to issue generally applicable regulations. Further, the EPA argues that requiring "best management practices" as the only effluent limitations for the Coal Remining Subcategory is a reasonable exercise of the EPA's discretion under the CWA. Finally, the EPA argues that we must affirm its rule applying the more strict, otherwise-applicable regulations (as opposed to weakened alternative regulations) to commingled waste streams because the EPA relied on an existing regulation in promulgating it.

The EPA defends the Western Alkaline Coal Mining Subcategory with several arguments. First, it repeats its argument that non-numeric effluent limitations are acceptable under the CWA. Next, with regard to western alkaline coal mines, the EPA argues that numeric limitations are infeasible. The EPA bases this argument upon its scientific conclusion that sedimentation ponds cause serious, adverse non-water-quality impacts in the arid West, and upon the assumption that using sedimentation ponds is necessary for a miner to comply with the numerical limitations. Third, the EPA argues that its scientific conclusions support the decision to create the subcategory, and this decision was not arbitrary, capricious, or unreasonable. Finally, the EPA argues that setting effluent limits at premined background levels is consistent with both the CWA and the SMCRA.

## ANALYSIS

We enter this analysis with caution. Most challenges to administrative agency action involve an agency's construction of a single word or phrase in its enabling statute. In contrast, we here examine an agency's construction of the statute (more or less) as a whole. Instead of relying upon a single section or subsection of CWA as its authority to promulgate the Final Rule, the EPA references no fewer than seven sections.[60] In reviewing the EPA's Final Rule, we must therefore look to each of these seven sections, all of their subsections, and all of the cross-referenced sections within to determine the scope of the EPA's power.

---

[60] *See* 67 Fed. Reg. 3371 (Jan. 23, 2002) (labeling CWA §§ 301, 304, 306, 308, 402, 501, and 502 as EPA's legal authority for the Final Rule).

# I. Coal Remining Subcategory

## A.

We first decide whether CWA § 304 grants to the EPA the power to create a subcategory under the Coal Mining Point Source Category and to promulgate regulations that conflict with the Rahall Amendment for that subcategory. The Petitioners argue that the CWA does not, and that the Final Rule must be stricken down for this reason. The EPA, however, contends that it had power to create regulations for remining under the CWA even where such regulations conflict with the Rahall Amendment.

We review an agency's construction of its enabling statute under the two-step test articulated by the Supreme Court in *Chevron, U.S.A. v. Natural Resources Defense Council*.[61] First, we ask whether Congress has spoken directly to the specific issue at hand.[62] If it has, we must give effect to Congress' clearly expressed intent. However, if the statute is ambiguous, we move to the second step, which calls for broad deference to the administrative agency. In the second step, we may invalidate an agency action only if it relies on an impermissible construction of the statute.[63]

Applying the *Chevron* standard, we conclude that the CWA does not explicitly address whether the EPA has the power to create a subcategory under the Coal Mining Point Source Category and to promulgate regulations for that subcategory that conflict with the Rahall Amendment. CWA § 304(b) provides the EPA with a general authority (indeed, a duty) to create regulations ("effluent limitation guidelines") for various classes and categories of point sources. It does not address the Rahall Amendment's relationship to these regulations. Further, the Rahall Amendment is silent on the issue of the Administrator's power to create additional subcategories under the Coal Mining Point Source Category. We must therefore move on to the second prong of *Chevron*–whether the agency's interpretation of the statute is reasonable.

Generally, when an agency issues a rule that contradicts the enabling statute, the rule is "in excess of statutory jurisdiction," and therefore violates the APA. This case presents an exception to that rule because the Rahall Amendment does not define or even limit the EPA's authority to issue generally applicable regulations. Instead, the Rahall Amendment merely provides a way for coal reminers to opt out of generally applicable effluent limitation regulations and to obtain permits that include modified effluent limitations. The Rahall Amendment is wholly silent regarding the EPA's authority to promulgate implementing regulations that go beyond its provisions.[64]

CWA § 304(b) requires the EPA to issue effluent limitations for various pollutants and for various levels of technology. CWA § 402(a) further directs the EPA Administrator to incorporate these regulations into NPDES permits issued to individual polluters. The Rahall Amendment gives reminers an alternative to the generally applicable effluent limitation regulations. Under the Rahall Amendment, the Administrator (or other NPDES-permit-issuing authority) may issue a modified permit. The Rahall Amendment thus does not create a particular regulatory scheme that applies to all coal remining operations. On the contrary, it creates an avenue for reminers to opt out of the generally applicable regulations.

The Clean Water Act's text and structure support this interpretation of the statute. First, CWA § 304(b) directs the EPA to issue generally applicable guidelines. Second, these guidelines gain the force of law through CWA § 301(b). Third, they create obligations on polluters through NPDES permits. The

---

[61] 467 U.S. 837 (1984).

[62] *Id.* at 842.

[63] *Id.* at 843.

[64] For this reason, the EPA's arguments that it enacted the Final Rule in part to implement the Rahall Amendment are without merit. The Rahall Amendment authorizes EPA to modify the effluent limitation guidelines in *individual permits*; it does not authorize the EPA to issue generally applicable rules pertaining to coal remining. Any such rules and regulations must come under the EPA's general authority to issue effluent limitation guidelines under CWA § 304(b).

Rahall Amendment says that the Administrator "*may* issue a permit . . . which modifies the [generally applicable effluent limitations]"[65] for pre-existing discharge in various areas of a coal remining operation. In no way does the Rahall Amendment require coal remining operators to seek such modified permits. Instead, remining operators remain able to seek permits under the generally applicable effluent limitation guidelines that the EPA promulgated under CWA § 304(b). Such permissive language conflicts with Petitioners' argument that the Rahall Amendment creates a generally applicable regulatory scheme, with which EPA's § 304(b) regulations must remain consistent. To the contrary, the § 304(b) regulations precede (both temporally and logically) any application of the Rahall Amendment. In these ways, the Rahall Amendment does not create a generally applicable scheme of regulating remining operators, binding on all such operators. Instead, it creates a way for remining operations to avoid the generally applicable EPA regulations issued under § 304(b).

Here, the EPA promulgated a rule that created new generally applicable regulations for coal reminers. These regulations parallel the Rahall Amendment in some respects and run contrary to the Rahall Amendment in others. Because the text and structure of the Clean Water Act compel the conclusion that the Rahall Amendment is an opt-out, rather than a generally applicable regulatory scheme, these inconsistencies with the Rahall Amendment do not put the Final Rule in tension with the statute. Instead, the new Final Rule provides a new set of generally applicable regulations (applicable to all remining operators), from which remining operators are still free to opt out via the Rahall Amendment's alternative procedures.[66]

For these reasons, the EPA's reading of the Clean Water Act, allowing it to promulgate regulations for the Coal Remining Subcategory, is reasonable. Having concluded that the EPA has the authority to issue regulations of this type, we now turn to the validity of the individual regulations.

**B.**

Even though the EPA's conclusion that it may issue regulations that differ from the Rahall Amendment is reasonable, the EPA's Coal Remining Subcategory regulations cannot stand because they are "without observance of procedure required by law."[67]

The CWA contemplates a five-step process of creating and implementing effluent limitations. First, the EPA must identify which control measures and practices are available to the various categories and classes of point sources.[68] Second, the EPA identifies the factors that it will take into account when deciding which of these control measures and practices apply to point sources within the various categories and classes.[69] It must do so for the three levels of technology described in the statute–BPT,[70] BAT,[71] and

---

[65] 33 U.S.C. § 1311(p)(1) (emphasis added).

[66] Petitioners also argue that the Final Rule must be stricken down because its definition of "remining operation" differs from that contained in the Rahall Amendment. *Compare* 33 U.S.C. § 1311(p)(3)(A) (defining a coal remining operation as "a coal mining operation which begins after February 4, 1987, at a site on which coal mining was conducted before August 3, 1977"), *with* 40 C.F.R. § 434.70(a) (defining a coal remining operation as "a coal mining operation at a site on which coal mining was previously conducted and where the site has been abandoned or the performance bond has been forfeited").

According to Petitioners, this conflict renders EPA's action inconsistent with the statute, and therefore invalid. Petitioners are mistaken. The definitions contained within the Rahall Amendment pertain only to the Rahall Amendment, as CWA § 301(p)(3) indicates by limiting the reach of its definitions to the "purposes of this subsection[.]" 33 U.S.C. § 1311(p)(3). Because EPA issued its Final Rule under its § 304(b) authority, it is not constrained by the definitions that apply only within the context of CWA § 301(p).

[67] 5 U.S.C. § 706(2)(D).

[68] 33 U.S.C. § 1314(b)(3).

[69] *Id.* at §§ 1314(b)(1)(B), 1314(b)(2)(B), & 1314(b)(4)(B).

[70] *Id.* at § 1314(b)(1)(B).

[71] *Id.* at § 1314(b)(2)(B).

BCT.[72]  Third, the EPA must determine, "in terms of amounts of . . . pollutants, the degree of effluent reduction attainable through the application of" the three technological levels.[73]  These three steps each occur under CWA § 304(b).

Fourth, these guidelines gain the force of law under CWA § 301(b), which states that compliance with the guidelines created under § 304 "shall be achieved" by certain dates.[74]  Finally, the EPA must incorporate the guideline limitations into NPDES permits given to individual polluters.[75]  At this step, compliance with the requirements becomes mandatory for individual dischargers, as CWA § 402(a) establishes that compliance with § 301 is a prerequisite to issuance of a permit.[76]

Under the statute, the EPA should have first identified the technological tools available to coal reminers and then determined the amount of effluent reduction attainable.  Instead, the EPA started the regulation process by defining the level of pollution the agency desired (maintaining "baseline loadings") and then worked backward to define the technological tools as site-specific "plans" that would achieve the desired level of pollution.  This is problematic not only because it is backwards–the EPA defines the pollution control technologies in terms of the desired outcome, rather than defining required outcomes in terms of that which the available technology can achieve–but more importantly because it shirks the EPA's duty under CWA § 304(b) to determine the degree of effluent *reduction attainable.*  Essentially, the EPA's Final Rule defines the attainable reduction at zero, without ever exploring the prospect of accomplishing more.

In some circumstances, such as when the levels of pollution have fallen so low as to reach fully the technological controls' capabilities, the degree of effluent limitation attainable might actually be zero.  However, setting the attainable effluent limitation at zero is arbitrary and capricious when the EPA effectively defines the available levels of technology as those that will result in *no increase* of pollution, without any requirement that the limitations actually reduce pollution.  Such circular reasoning contravenes "the national goal of eliminating the discharge of all pollutants" expressed in CWA § 301(b)(2)(A).[77]  It further contravenes the EPA's duties under  CWA §§ 304(b)(1)(A), (b)(2)(A), and (b)(4)(A) to "determine . . . the degree of effluent reduction *attainable*" for the various levels of technology, and to do so "in terms of *amounts* of constituents."[78]  We hold that where the EPA fails to determine how much reduction in pollution is possible, and to do so by reference to the *amounts* of pollutants, the EPA deviates from CWA's statutory commands.

The EPA's decision to use background conditions as effluent limits is also problematic because it results in a different effluent limitation for each site.  Such a "keep it as it is" approach does not even approximate needed uniformity in the regulations.  While the CWA does not mandate strict uniformity,[79] courts have recognized that the CWA disallows plant-by-plant regulations.  In *Texas Oil & Gas Association v. EPA*, the Fifth Circuit held that the CWA does not require the EPA to maintain absolute uniformity among effluent limitations within a single category or subcategory of point sources.[80]  However, the court also noted "the textual mandate of the CWA that [effluent limitation guidelines] be established for 'categories

---

[72] *Id.* at § 1314(b)(4)(B).

[73] *Id.* at §§ 1314(b)(1)(A), 1314(b)(2)(A), & 1314(b)(4)(A).

[74] *Id.* at § 1311(b).

[75] *Id.* at § 1342(a)(1).

[76] *Id.*

[77] *Id.* at § 1311(b)(2)(A).

[78] *Id.* at §§ 1314(b)(1)(A), 1341(b)(2)(A), & 1314(b)(4)(A) (both emphases added).

[79] Consider, for example, the Rahall Amendment, which allows the NPDES permit issuer to modify the otherwise-applicable limitations for certain coal reminers. *Id.* at § 1311(p).  Additionally, if "fundamentally different factors" apply to a particular discharger, the Administrator may grant a variance on the basis of those differences. *Id.* at § 1311(n).

[80] 161 F.3d 923, 937-38 (5th Cir. 1998).

and classes' rather than individual point sources,"[81] and "agree[d] that Congress intended to foreclose plant-by-plant evaluation of facilities within a subcategory."[82] The EPA's decision to set effluent limitations through sole reliance upon site-specific factors thus runs afoul of this policy against site-specific regulations.

For the above reasons, we conclude that setting background conditions as effluent limitations violates the text of CWA and thus relies on an unreasonable reading of the statute.[83] Therefore, we strike down the regulations setting effluent limitations for the Coal Remining Subcategory.[84]

## C.

An additional problem with the EPA's Final Rule lies in the EPA's failure to consider all the factors the CWA requires it to consider. Subsections 304(b)(1)(B), (b)(2)(B), and (b)(4)(B) require the EPA to consider a list of factors when establishing which control measures shall become BPT, BAT, and BCT.[85] These factors are

> the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and other such factors as the Administrator deems appropriate.[86]

Although the EPA has broad discretion in determining the amount of weight to assign to each factor,[87] it may not ignore a factor altogether.[88]

The record in this case provides no evidence that the EPA took each of these factors into account when prescribing the pollution control measures that became part of the various technological levels for the two new subcategories. The EPA's Proposed Rule[89] goes so far as to list the factors in its discussion of BPT for the Coal Remining Subcategory,[90] yet it contains no evidence that the EPA actually considered them. For instance, the Proposed Rule contains no discussion or even information on the age of the equipment and

---

[81] *Id.* at 938.

[82] *Id.* at 939.

[83] We reserve judgment on the EPA's argument that it is reasonable to dub "best management practices" as effluent limitations. The EPA spent a considerable portion of its brief making this argument, which basically parrots the above-described argument that effluent limitations need not be numeric.

We note, however, that the EPA's own regulation renders this argument a red herring. The EPA lists best management practices in 40 C.F.R. § 434.72(a), which describes the controls constituting the best practicable technology (BPT). However, § 434.72(b)(1)–the subsection that sets out the applicable effluent limitations–contains nary a reference to best management practices. Instead, subsection (b)(1) lists the effluent limitation as "May not exceed baseline loadings[.]" 40 C.F.R. § 434.72(b)(1).

Further, while it may be permissible to establish best management practices as an effluent limitation, the CWA hints that this limitation unaccompanied by a numeric guideline might run afoul of the statute. CWA § 304(b) requires the EPA to "publish . . . regulations, providing guidelines for effluent limitations." 33 U.S.C. § 1314(b). The statute thus contemplates that the EPA's guidelines (and therefore the regulations that contain them) will contain something beyond a mere recitation of the effluent limitations the EPA has chosen. Further, CWA § 304(e) permits the EPA to publish best management practices that are "supplemental to any effluent limitations." *Id.* at § 1314(e). This provision strongly hints that the drafters of the CWA envisioned best management practices as being different from effluent limitations, rather than a type of effluent limitation.

[84] 40 C.F.R. §§ 434.72–434.75.

[85] 33 U.S.C. § 1314(b)(1)(B), (b)(2)(B), & (b)(4)(B).

[86] *Id.* at § 1314(b)(1)(B) & (b)(4)(B). Subsection § 304(b)(2)(B) contains all of the above, and also lists "the cost of achieving such effluent reduction" after "process changes." 33 U.S.C. § 1314(b)(2)(B)

[87] *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 928 (5th Cir. 1998) (citing *Nat. Res. Defense Council v. EPA*, 863 F.2d 1420, 1426 (9th Cir. 1988)).

[88] *Id.* at 934 (holding that an agency abuses its discretion when it ignores a statutory factor).

[89] 65 Fed. Reg. 19440 (Apr. 11, 2000).

[90] *Id.* at 19450-51.

facilities or of "the engineering aspects of the application of various types of control techniques." The discussions of BCT, BAT, and NSPS do not even list the factors.[91] The Final Rule fares no better.[92]

Therefore, from the record before us, we cannot conclude that the EPA followed Congress' statutory directives in determining the appropriate pollution controls to assign to point sources in the new subcategories. For this reason, we must further strike down the EPA's decision to set Pollution Abatement Plans featuring best management practices as BPT, BCT, and BAT for the Coal Remining Subcategory.

**D.**

The final issue we decide with regard to the Coal Remining Subcategory is whether the EPA may apply different standards to pre-existing discharges that have been commingled with wastes from active mining operations. Under the Final Rule, the EPA applies a lower standard for cleanup of pre-existing discharge at remining operations. However, for pre-existing discharge that became intertwined with wastes from active mining operations, the higher standard applicable to waste from active mining operations applies.[93] Petitioners challenge this regulation as too demanding. The EPA defends its decision to apply alternative standards to waste streams that have been commingled by arguing that it merely applied an existing regulation to the new context of coal reminers.

Petitioners argue that the Rahall Amendment prohibits the EPA from applying the stricter standards of the generally applicable § 304(b) regulations to pre-existing discharges that have commingled with other waste streams. As described previously, this argument is incorrect. Again, the Rahall Amendment functions only as an opt-out, not as a mandatory, generally applicable regulatory scheme. The Rahall Amendment therefore does not prohibit the EPA from applying its general commingling rule[94] to commingling of pre-existing discharges. Nor does any other provision of the CWA so prohibit. For these reasons, we grant the EPA the deference due to it in construing its own regulations, and conclude that the EPA may apply its commingling rule to pre-existing discharges.

**II. Western Alkaline Coal Mining Subcategory**

Petitioners also mount several arguments against the second new subcategory created by the Final Rule--the Western Alkaline Coal Mining Subcategory. First, they repeat their argument that the EPA lacks authority to impose non-numeric effluent limitation guidelines. Next, they say that even if the EPA had such authority, the decision to do so here was arbitrary, capricious, and inconsistent with the goals of the CWA and the SMCRA.

The regulations for the Western Alkaline Coal Mining Subcategory contain no numeric effluent limitations for total suspended solids, and no effluent limitations at all for settleable solids and pH. Under the regulations, each operator "must submit a site-specific Sediment Control Plan . . . designed to prevent an increase in the average annual sediment yield from pre-mined, undisturbed conditions."[95] Like the Pollution Abatement Plans applicable to the Coal Remining Subcategory, these Sediment Control Plans are

---

[91] *See id*. at 19452.

[92] *See* 67 Fed. Reg. 3370–3410 (Jan. 23, 2002).

[93] 40 C.F.R. § 434.71(b).

[94] 40 C.F.R. § 434.61 states:

Where waste streams from any facility covered by this part are combined for treatment or discharge with waste streams from another facility covered by this part, the concentration of each pollutant in the combined discharge may not exceed the most stringent limitations for that pollutant applicable to any component waste stream of the discharge.

This provision is not specific to the Coal Remining Subcategory; it applies to all subcategories in the Coal Mining Point Source Category.

[95] *Id.* at §434.82(a).

to feature best management practices.[96] Additionally, operators must demonstrate the plans' effectiveness "[u]sing watershed models."[97] These Sediment Control Plans constitute the only effluent limitation required for all three levels of technology,[98] and they contain no numeric limits on sediment whatsoever. Beyond the initial models there are no measurable checks on sediment levels at all.

The same reasoning detailed above in Parts I.B. and I.C. applies equally to the non-numeric limitations in the Western Alkaline Coal Mining Subcategory. By adopting non-numeric effluent limitations based upon background conditions, the EPA shirked its duties under CWA § 304(b) to determine in terms of the amounts of pollutants, the degree of effluent reduction attainable by the various levels of technology. Additionally, the EPA abused its discretion by failing to consider the factors spelled out in CWA §§ 304(b)(1)(B), (b)(2)(B), and (b)(4)(B) when deciding which control measures would become BPT, BAT, and BCT. For these reasons, we strike down the regulations implementing the Western Alkaline Coal Mining Subcategory.

## CONCLUSION

For the reasons described above, we invalidate the regulations contained in the EPA's Final Rule. We therefore REMAND this matter to the EPA with instructions to either withdraw the Final Rule or to issue a new rule, and to ensure that the provisions of which are consistent with this opinion.

---

[96] *Id.*

[97] *Id.* at § 434.82(b).

[98] *See id.* at § 434.82 (BPT); § 434.83 (BAT); § 434.84 (BCT).

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SUHRHEINRICH, Circuit Judge, concurring in part, and dissenting in part. I concur in Part I.A. of the majority opinion. I agree that the EPA has reasonably interpreted the Clean Water Act with respect to its authority to regulate. The opt out measures allowed by the Rahall Amendment do not limit the EPA's authority to create and regulate subcategories such as the Coal Remining Subcategory and the Western Alkaline Coal Mining Subcategory.

The majority nevertheless strikes down the regulations that the EPA promulgated for these new subcategories. The majority holds that these regulations were not made in observance of procedure required by law because the EPA failed to follow the steps set forth in the Act. *See supra* Part I.B. The majority also holds that the EPA did not weigh the required statutory factors prior to regulating as it did. *See supra* Part I.C. The majority applies these holdings to the regulations for both subcategories. *See supra* Part II. I write separately because I disagree with the majority's analysis on these points.

As to the majority's holding that these regulations were not made in observance of procedure required by law because the EPA failed to follow the "steps" set forth in the Act, I must note that Petitioners did not even argue that these regulations were not made in observance of procedure required by law, much less that the EPA failed to follow the steps created by the majority. Petitioners have argued only that the regulations are arbitrary and capricious. *See Brief of Petitioners*, pp. 21, 23, 51, 53-54, 63, 65; *Reply Brief of Petitioners*, pp. 24, 27, 29.

In any event, I fail to see any statutory language requiring the EPA to follow a five-step process when promulgating effluent limitation guidelines, much less to take the steps in the order contemplated by the majority. There is no sequential language in these provisions, i.e., words such as "first," "then," "next," "before," or "after." This statute merely requires the EPA to do certain things when promulgating these particular guidelines.

The majority nevertheless would require the EPA to promulgate effluent limitation guidelines under 33 U.S.C. § 1314(b) in a constrained, step-wise fashion starting with subsection (b)(3). Then the EPA would have to meet subsections (b)(1)(B), (b)(2)(B), and (b)(4)(B). Next, the EPA would have to proceed to meeting subsections (b)(1)(A), (b)(2)(A), and (B)(4)(A). After that, it would need to meet the time-lines under the introductory paragraph of subsection (b), and finally would be required to issue permits in accord with 33 U.S.C. § 1342(a)(1). Needless to say, these five steps are not even in the order in which the statute is drafted. I see no language from which one could even infer that Congress intended the EPA to start in the middle of subsection (b) whenever it promulgated guidelines for effluent limitations. Moreover, the majority's fifth step is found only in a separate provision that subsection (b) does not even reference. Thus, the majority creates a series of steps the EPA must follow that appears nowhere in the statutory language and which are not even urged on us by the Petitioner as a reason for striking down these regulations.

More problematic, however, is that the majority then uses this artificial series of steps to chastise the EPA for engaging in what the majority views as circular reasoning. Because the majority believes that the technological tools must be assessed first and then the EPA must determine the amount of effluent reduction attainable with those technologies, it finds impermissible the EPA's decision to define baseline loadings that can then be addressed with BMPs. The majority's approach, however, seems to require the EPA to work in a vacuum, without consideration of the ultimate goal. If the majority must create steps, it would seem much more logical for the EPA to first establish a goal consistent with the framework enacted by Congress in the Clean Water Act, and then determine the means by which it can be best achieved, as the EPA apparently did here once it was clear that the existing effluent limitations were not producing positive results when applied to the narrow problem of remining.

Here, the EPA was addressing very specific problems associated with remining. It recognized that the prior regulations made no distinction between previously mined lands and virgin lands, thereby requiring both to meet the same standard of cleanliness. Because the costs associated with bringing the previously mined lands into compliance with those regulations were prohibitive, those effluent limitation guidelines were not effective in reducing acid mine drainage from abandoned mine lands *because operators would not remine the area*. While experience after the Rahall Amendment showed that remining under modified permits was successful in improving the acid mine drainage, many miners remained hesitant to obtain the modified permits without further EPA action. Had the EPA done nothing, in light of this problem, it would not have been acting to fulfill the mandate of Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §1251.

In my review of the record, the baseline loadings were set in response to the negative experiences associated with the adoption of the various appropriate technologies. The EPA recognized that although the technologies *theoretically* could have resulted in a degree of effluent reduction at abandoned mines, they would fail to do so whenever the land was not remined. In other words, where miners would not remine, it seems the degree of reduction *actually* attainable at abandoned mines would be zero. The baseline loadings, therefore, were not set "before" considering the technology, as the majority suggests, but *after* it became clear that the technological guidelines could not be successful. In short, the "failure" of the EPA to follow the five-step process created by the majority simply is not a basis on which these regulations can be struck down.

The majority also holds that the EPA did not weigh the required statutory factors prior to regulating as it did. In particular, the majority finds no evidence that the EPA considered any information about the age of the equipment and facilities, or of the engineering aspects of the application of the various types of control techniques for BPT, BAT, BCT and NSPS. As before, Petitioners did not make this argument. But, even if they did, I think the majority misunderstands the EPA's Final Rule.

In its Final Rule, the EPA explains that it adopts BMP for BAT because such abatement plans "should, in most cases, achieve reductions below baseline discharge levels." 67 Fed. Reg. 3379 (Jan. 23, 2002). It goes on to explain that it adopted BMPs for BAT because "there are no more stringent technologies that are economically feasible." *Id.* at 3380. For the same reason, it applied the BMP to BCT and BPT. *Id.*

Congress has authorized BMPs to supplement effluent limitations. 33 U.S.C. § 1314(e). The EPA has defined BMPs as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices *to prevent or reduce* the pollution of 'waters of the United States.'" 20 C.F.R. § 122.2 (July 1, 2003) (emphasis added). BMPs consist of "treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." *Id.* The EPA has provided that BMPs are permissible conditions in NPDES permits when "[n]umeric effluent limitations are infeasible." 20 C.F.R. § 122.44(k)(3).

BPTs, on the other hand, consist of "technology" that can attain "a degree of effluent reduction," 33 U.S.C. § 1314(b)(1)(A), as do BATs, 33 U.S.C. § 1314(b)(2)(A), and BCTs, 33 U.S.C. § 1314(b)(4)(A). For those instances where the EPA finds that discharges can be reduced or eliminated during remining by certain practices without the need to resort to technologies, the very technologies which would not be used because the land would not be remined, it would seem that adoption of BMPs as the guideline would satisfy the statute because they supplement the effluent limitations. Accordingly, there would be no need for the EPA to reconsider all the factors required in formulating BAT, BPT, and BCT in the first instance. *See* 33 U.S.C. §§ 1314(b)(1)(B), 1314(b)(2)(B), 1314(b)(4)(B).

In any event, the record is replete with documents reflecting that the EPA engaged in considerations of costs and other required factors, especially non-water-quality environmental impacts. To the extent that the EPA may not have considered age of equipment and facilities or engineering aspects, I am by no means

convinced that it could have considered such factors because (1) BMPs generally consist of things that are *not* equipment or facilities, (2) they likely do not have engineering aspects, and (3) these regulations were made in light of existing regulations.

An example of a BMP includes the activity of applying lime.  67 Fed. Reg. at 3377.  Other BMPs are regrading and revegetation, diversion ditches, allowing limited or no augur mining, and various types of channels, drains and wells.  Coal Remining Best Management Practices Guidance Manual, EPA 821-B-01-010, pp. 22-24 (December 2001) (*available at*  http://epa.gov/waterscience/guide/coal/bmp/ last visited July 28, 2004) (a supporting document incorporated by reference into the regulations, 67 Fed. Reg. at 3371).  Although these BMPs may require use of equipment, a backhoe for example, they are not in and of themselves equipment, much less facilities.  Instead, they are often how land around the mines is changed and managed.   And, to the extent that a BMP might involve use of an augur or other piece of equipment, it is not the age of the augur that is relevant, but whether and to what extent it can be used at all.  Thus, there is no "age" for the EPA to consider.

Likewise, I am not persuaded that there are engineering aspects for the EPA to consider given the nature of BMPs.  For example, what aspect of engineering would be involved in revegetation?  Similarly, what aspect of engineering is involved in prohibiting or limiting a practice, like augur mining?  I submit that there aren't any.

Moreover, as discussed previously, these regulations were promulgated because the existing regulations were not producing the desired results in the narrow instances of abandoned mines that could be remined.  There is no allegation by Petitioners that the EPA failed in the first instance to consider the required factors.  In short, the EPA should not be faulted for not reconsidering factors that simply are not relevant in the narrow context of the subcategories at issue.  Accordingly, I cannot agree with the majority's conclusion that the Rule must be held invalid for failure to consider all the statutory factors.  If the majority thinks the record is insufficient, it would be better to remand the matter to the EPA, with a request to supplement the record, than to strike down the Rule.  In any event, the EPA's regulations, viewed in light of the unique problem it was trying to correct in the narrow context of remining, seem eminently reasonable, and certainly are not arbitrary or capricious.

Before concluding, I pause here to address Petitioner's argument pertaining to the Rule's lack of numerical limits.  Although whispers of it can be found in a careful reading of the opinion, the majority does not openly address it.

We must always start with the statutory text and presume that Congress "says in a statute what it means and means in a statute what it says." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992).  It is clear that Congress knows how to specify that it requires "numerical" limitations when that is what it wants to convey because Congress required the EPA to set "specific numerical effluent limitations" in 33 U.S.C. § 1311(p).  That provision, however, does not require generally applicable effluent limitation guidelines to have specific numerical limitations.  In directing that generally applicable effluent limitation guidelines be promulgated, Congress did not require "numerical" limitations.  *See* 33 U.S.C. § 1314(b).  Instead, Congress specified that the EPA identify "*amounts* of constituents and chemical, physical, and biological characteristics of pollutants." *Id.*

The word "amount" is defined not only as a quantity, number or sum, but also as "the whole or final effect, significance, or import."  Webster's Third New International Dictionary 72 (unabridged 1971); *see also* American Heritage Dictionary 103 (2d college ed. 1982) (defining the word "amounts" as "[t]he aggregate effect or meaning; import"); Black's Law Dictionary 83 (6th ed. 1990) (defining "amount" as "[t]he whole effect, substance, quantity, import, result, or significance").  Indeed, the term "amounts" as

used in § 304 could denote Congress's intent that the EPA set effluent limitation guidelines in terms of the effect, substance, import, or effect of a pollutant, not just its sheer quantity.[1]

Such a conclusion is buttressed by other statutory language. For example, Congress defined "effluent limitation" as "*any* restriction established by a State or the Administrator on quantities, rate, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, *including schedules of compliance*." 33 U.S.C. § 1362(11) (emphases added). Moreover, Congress also provided that

> Whenever, in the judgment of the Administrator, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under (s 301(b) of the Act), would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limitations (including alternative effluent control strategies ) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality.

33 U.S.C. § 1312(a). In fact, this Court has previously noted in dicta that "Congress did not regard numeric effluent limitations as the only permissible limitation on a discharger." *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1380 n.21 (6th 1977) (citing 33 U.S.C. § 1312(a)). These statutory provisions thus further counsel against limiting the definition of "amounts" to an expression of numerical limitations as these statutes encompass any restriction, including compliance schedules, and contemplate alternative strategies that "can reasonably be expected to contribute to the attainment or maintenance of" water quality.

In sum, I would hold that § 304 does not evince that Congress has "directly spoken" that the EPA should set numeric effluent limitation guidelines. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) (noting that when Congress has "directly spoken" on an issue a reviewing court "must give effect to the unambiguously expressed intent of Congress"). Because Congress did not unambiguously require the EPA to set numeric effluent limitation guidelines, EPA's regulations should not be invalidated on this basis.

Finally, Petitioner's remaining claims, that were not addressed by the majority, are without merit. Moreover, I would affirm the regulations because the EPA's construction of the statute is reasonable and therefore permissible.

In sum, for the reasons discussed, I would affirm these regulations in their entirety.

---

[1] One specific requirement challenged by Petitioners is that under 40 C.F.R. § 434.82. a BMP "will result in average annual sediment yields that will not be greater than the sediment yield levels from premined, undisturbed conditions." See Brief of Petitioner's at 62. Although this standard is not numeric in the sense that it requires a sediment quantity of X, it certainly is a standard that requires assessments of a quantity and comparisons of that quantity to a another predetermined quantity. Thus, it is akin to a formula that reflects a result, or a number in the context of a result sought, or the import of the number as compared to a standard. Therefore, it satisfies the definition of an "amount."